UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
ANDREW ABEYTA,

                Plaintiff,

       -against-                    12 CV 5623 (KBF)

THE CITY OF NEW YORK,
NANHAO CHEN and ALLAN TAEZA,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S MEMORANDUM OF LAW IN PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR BIRURCATION

Dated:  New York, New York
         September 3, 2013

                                   *Sivin & Miller, LLP*
                                 *Attorneys for plaintiff*
                        *20 Vesey Street, Suite 1400*
                           *New York, NY  10007*
                             *(212) 349-0300*

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT**........................................................................1

Plaintiff's Positions On The Motions............................................................1

The Underlying Incident..............................................................................1

**STATEMENT OF FACTS**.................................................................................4

Plaintiff's Version.........................................................................................4

The Medical Records....................................................................................9

Chen's Version............................................................................................10

Taeza's Version...........................................................................................14

Foster's Version..........................................................................................15

**ARGUMENT**

**POINT I**

DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO
ARREST OR FORCIBLY DETAIN PLAINTIFF...................................16

**POINT II**

DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
IMMUNITY..............................................................................................19

**POINT III**

DEFENDANTS USED EXCESSIVE FORCE AND COMMITTED
AN ASSAULT AND BATTERY AGAINST PLAINTIFF....................21

A. Plaintiff's Fourth Amendment Excessive Force Claim..........................21

B. Plaintiff's State-Law Claim For Assault And Battery  .......................25

**POINT IV**

PLAINTIFF'S FIRST AMENDMENT CLAIM .......................................26

**POINT V**

THIS COURT SHOULD SEARCH THE RECORD AND
AWARD JUDGMENT TO PLAINTIFF AND AGAINST CHEN
ON THE FIRST, SECOND, THIRD, AND FOURTH CAUSES
OF ACTION IN PLAINTIFF'S AMENDED COMPLAINT...................27

**POINT VI**

DEFENDANTS' MOTION FOR BIFURCATION SHOULD
BE DENIED ..............................................................................................28

**CONCLUSION**................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

Aczel v. Labonia, 92 Fed.Appx. 17 (2nd Cir. 2004) .......................................................19

Bartels v. Inc. Vill. of Lloyd, 751 F. Supp. 2d 387 (E.D.N.Y. 2010)...............................26

Bradley v. City of New York, 2007 U.S. Dist. LEXIS 7811 (S.D.N.Y. 2007) ...........................27

Broughton v. State, 37 NY2d 451 (1975)...................................................................16

Budgar v. State of New York, 98 Misc.2d 588, (1979)...................................................25

Coach Leatherware Co. v. Ann Taylor, Inc., 933 F.2d 162 (2nd Cir. 1991)...............................27

Codling v. City of New York, 68 Fed.Appx. 227 (2nd Cir. 2003) ...................................19

Connecticut Crim. Defense Lawyers Ass'n v. Forst (In re State Police Litig.),
      88 F.3d 111 (2nd Cir. 1996) ...........................................................................19

Curley v. Village of Suffern, 268 F.3d 65 (2nd Cir. 2001) ..............................................26

Dallas v. Goldberg, 143 F. Supp. 2d 312 (S.D.N.Y. 2001)...............................................28

Desardouin v. City of Rochester, 708 F.3d 102 (2nd Cir 2013)........................................17

Elufe v. Aylward, 2011 U.S. Dist. LEXIS 11037 (E.D.N.Y. 2011) ...................................24

Flores v. City of Mount Vernon, 41 F. Supp. 2d 439 (S.D.N.Y. 1999) .........................27

Floyd v. City of New York, 2013 U.S. Dist. LEXIS 113271 (S.D.N.Y. 2013) ...........................25

Gill v. Calescibetta, 157 Fed. Appx. 395 (2nd Cir. 2005)..............................................26

Gonzalez v. City of New York, 2000 U.S. Dist. LEXIS 5230 (E.D.N.Y. 2000) .........................22

Hayes v. New York City Police Dep't, 212 F. App'x 60 (2nd Cir 2007).................................23

Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340 (2nd Dep't 1997)..............................25

Kerman v. City of New York, 374 F.3d 93 (2nd Cir. 2004) ..............................................20

Lawson v. New York City Housing Authority, 223 AD2d 532 (2nd Dept. 1996)........................17

Lewis v. City of New York, 689 F. Supp. 2d 417 (E.D.N.Y. 2010) .............................................28

Lindsey v. Butler, 2013 U.S. Dist. LEXIS 88601 (S.D.N.Y. 2013).............................................23

Llerando-Phipps v. City of New York, 390 F. Supp. 372 (S.D.N.Y. 2005)..................................28

Mahan v. City of New York, 2005 U.S. Dist. LEXIS 14322 (E.D.N.Y. 2005) ...........................14

Mallory v. United States, 354 US 449 (1957) ...........................................................................16

Matthews v. City of New York, 889 F. Supp. 418 (E.D.N.Y. 2012) ........................................21

Maxwell v. City of New York, 380 F.3d 106 (2nd Cir. 2004) ................................................22, 23

Mejia v. City of New York, 119 F. Supp. 2d 232 (E.D.N.Y. 2000).........................................21,22

Morrison v. Johnson, 429 F.3d 48 (2d Cir. 2005) .......................................................................26

National Union Fire Ins. Co. v. Airborne Freight Corp.,
    2000 U.S. Dist. LEXIS 12773 (S.D.N.Y.)..........................................................................21

Nicholas v. City of Binghamton, 2012 U.S. Dist. LEXIS 111736 (N.D.N.Y. 2012)....................18

Pawloski v. State, 45 Misc.2d 933, 258 N.Y.S.2d 258 (1965) ......................................................25

Robison v. Via, 821 F. 2d 913 (2nd Cir. 1987) ............................................................................23

Roundtree v. City of New York, 778 F. Supp. 614 (E.D.N.Y. 1991) ...........................................24

Simpson v. Saroff, 741 F. Supp. 1073 (S.D.N.Y. 1990) ...............................................................24

Smith v. County of Nassau, 34 NY2d 18 (1974).........................................................................16

Snead v. Bonnoil, 166 NY 325 (1901) .......................................................................................16

Spillman v. City of Yonkers, 2010 U.S. Dist. LEXIS 1838 (S.D.N.Y.) .......................................23

Tafari v. Goord, 2011 U.S. Dist. LEXIS 118871 (W.D.N.Y. 2011) .............................................29

Thomas v. City of New York, 2010 U.S. Dist. LEXIS 137166 (S.D.N.Y. 2010)...................19, 20

Thomas v. Roach, 165 F.3d 137 (2nd Cir. 1999) ........................................................................21

Thompson v. Beth Isr. Med. Ctr., 1999 U.S. Dist. Lexis 5411 (S.D.N.Y. 1999).........................19

Tracy v. Freshwater, 623 F.3d 90 (2nd Cir. 2010) ......................................................................24

Tsesarskaya v. City of New York, 843 F. Supp. 2d 446 (S.D.N.Y. 2012)....................................20

Vichare v. AMBAC Inc., 106 F.3d 457 (2nd Cir. 1999)................................................................28

Vincent v. Yelich, 718 F.3d 157 (2nd Cir. 2013) ..........................................................................19

Walczy v. Rio, 496 F.3d 139 (2nd Cir. 2007) ...............................................................................17

Weyant v. Okst, 101 F.3d 845 (2nd Cir. N.Y. 1996).....................................................................26

Williams v. City of New York, 2007 U.S. Dist. LEXIS 55654 (S.D.N.Y. 2007) ........................24

Wims v. City of New York, 2011 U.S. Dist. LEXIS 78641 (S.D.N.Y. 2011) ..............................24

Woodson v. New York City Housing Auth., 10 NY2d 30 (1961) .................................................16

Yuan v. Rivera, 48 F. Supp. 2d 335 n.6 (S.D.N.Y. 1999) ............................................................27

Zellner v. Summerlin, 494 F.3d 344 (2nd Cir. 2007) ....................................................................18

## Statutes

28 U.S.C. § 1332.............................................................................................................................25

N.Y. Penal Law § 240.20................................................................................................................17

## Rules

Fed. R. Civ. P. 42(b)......................................................................................................................28

# PRELIMINARY STATEMENT

This memorandum of law and the accompanying Affidavit of Andrew Abeyta, Declaration of Edward Sivin, and supporting exhibits are submitted by plaintiff in partial opposition to defendants' motion for summary judgment and in opposition to defendants' motion to bifurcate the liability and damages portions of the trial.

## Plaintiff's Positions On The Motions

Plaintiff does not oppose defendants' summary judgment motion to the extent that it seeks dismissal of the Sixth Cause of Action (state-law claim for intentional infliction of emotional distress) asserted in plaintiff's amended complaint.  Plaintiff opposes defendants' motion to dismiss his First Cause of Action (state-law claim for assault and battery), Second Cause of Action (federal claim for excessive force in violation of the Fourth Amendment), Third Cause of Action (state-law claim for false arrest/imprisonment), Fourth Cause of Action (federal claim for false arrest in violation of the Fourth Amendment), and Fifth Cause of Action (federal claim for unlawful retaliation for plaintiff's exercise of his rights under the First Amendment).  Additionally, plaintiff requests that the Court search the record and grant plaintiff summary judgment on the first four causes of action *only as against defendant Nanhoa Chen*.  Plaintiff maintains that Chen's deposition testimony establishes as a matter of law that his seizure and detention of plaintiff were undertaken without probable cause nor other legal justification and that the force he used on plaintiff was excessive.

Plaintiff opposes defendants' alternative motion to bifurcate since the issues of liability and damages are in this case inextricably interwoven.  Additionally, bifurcation will inconvenience witnesses, result in significant added expense to plaintiff, and otherwise prejudice plaintiff in the preparation and presentation of his case.

**The Underlying Incident**

On Saturday, April 14, 2012 at approximately 7:00 p.m., after having left a restaurant/bar at which he consumed several drinks, plaintiff and his friend, Spencer Schlee, were walking near the intersection of Suffolk and Delancey Streets in the lower east side of Manhattan with a broken bicycle in tow.  Plaintiff approached a parked police car in which defendants NYPD Officers Nanhao Chen and Allan Taeza were seated and asked Chen for assistance, the nature of which is disputed.  Chen responded that he and his partner were occupied.  After plaintiff made a snide comment, Chen and Taeza exited their vehicle and without warning grabbed plaintiff and propelled plaintiff onto the hood of their car, causing plaintiff's head to strike the hood.  After he "came to," in handcuffs, and heard the officers accusing him of being intoxicated plaintiff asked that he be administered a sobriety test.  The officers then accused plaintiff of being an emotionally disturbed person ("EDP") and had him taken by ambulance to Bellevue Hospital Center.  Before the ambulance arrived the officers kept plaintiff handcuffed behind the back and in a prone position on the hood of their vehicle for approximately one hour.

After being taken by ambulance to Bellevue plaintiff remained handcuffed to a gurney for close to an hour under the watch of Chen, Taeza, and other NYPD officers.  His vital signs were taken but no psychological evaluation was performed.  Eventually plaintiff announced that he needed to use the men's room, and one of the officers removed his cuffs. Chen and Taeza then immediately bolted from the emergency room and plaintiff never saw them again.  Plaintiff never underwent a psychological evaluation—the reason given by defendants for bringing him to Bellevue in the first place—and was told instead by a Bellevue doctor he was free to leave.  Plaintiff was never issued a summons or desk appearance ticket and was not otherwise charged with any crime or violation.

2

Beginning the day after the incident plaintiff began vomiting and experiencing severe headaches, nausea, sensitivity to light, difficulty with balance, and neck and back pain. Plaintiff went to a neighborhood Urgent Care Center two days after the incident where he was evaluated and then taken by ambulance to the emergency room of NYU Medical Center. Plaintiff was diagnosed with a concussion. Subsequent medical evaluations have diagnosed significant cognitive and physical impairments associated with a post-concussion syndrome.

Prior to the incident plaintiff had no history of mental illness, had never been arrested, was a recent graduate of Columbia University, and was gainfully employed as a sustainability analyst for an energy consulting firm. Immediately following the incident plaintiff had difficulty working due to his symptoms. In June 2012, after missing a total of about one month from work and after his employer attempted unsuccessfully to accommodate his limitations, plaintiff was terminated from his employment. Unemployed and with no other local means of support, plaintiff had to give up his New York apartment and move back in with his mother in Woodland Hills, CA. Plaintiff remains unemployed and is still being actively treated at the Sports Concussion Institute in Los Angeles.

While collectively defendants do not concede all of the claims asserted above, at his deposition Chen effectively conceded enough to warrant summary judgment, at least against him, on plaintiff's state and federal causes of action for excessive force and false arrest. Chen testified that before he and Taeza propelled plaintiff forward onto the hood of their vehicle and kept him handcuffed there for an hour plaintiff did not threaten the officers or otherwise act violently and did not even raise his voice loud enough to be heard clearly through Chen's closed window. Chen also conceded that after plaintiff made his snide remark he and Taeza exited their vehicle and forcibly grabbed against plaintiff without first issuing any warnings, asking plaintiff

to step back,  nor otherwise attempting to speak with plaintiff.

Four days after his deposition, Chen's co-defendant Allan Taeza appeared for his deposition and irreconcilably contradicted Chen; he portrayed plaintiff essentially as a raging lunatic who was taken to Bellevue after he assaulted the two officers.  Assuming the Court does not find it to be incredible as a matter of law, Taeza's testimony concededly raises triable issues of fact precluding an award of summary judgment *against Taeza*.  His testimony, however, cannot serve to defeat summary judgment *against Chen*, who is bound by his own testimony and admissions, and it certainly does not warrant summary judgment in favor of either of the defendant police officers or The City of New York.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 for a summary of the evidence that plaintiff maintains warrants a denial of defendants' motion for summary judgment and/or bifurcation.  Plaintiff maintains that the evidence also entitles this Court to search the record and grant summary judgment in favor of plaintiff and against Chen on the First, Second, Third, and Fourth Causes of Action asserted in plaintiff's amended complaint.

### Plaintiff's Version

On April 14, 2012, plaintiff was a recent graduate from Columbia University who lived in Manhattan and was employed as a sustainability analyst for Manhattan-based Ecological LLC, an energy sustainability consulting firm.  Transcript of June 18, 2013 deposition of Andrew Abeyta, attached to the Declaration of Edward Sivin ("Sivin Declaration"), as Exhibit 1 ("Abeyta Tr.") at 19:03-16; 120:11-13.  Plaintiff's most recent employment review at Ecological LLC reported that plaintiff "met" or "exceeded" all expectations. *See* December 21, 2011

Employee Annual Check-In, attached to Sivin Declaration as Exhibit 13.  Plaintiff had never

been arrested and had never been treated for any psychological, emotional, mental health, or

substance abuse problem.  Affidavit of Andrew Abeyta, sworn to August 28, 2013, attached to

the Sivin Declaration as Exhibit 2 ("Abeyta Affidavit) at ¶ 1.

   On the day of the incident, sometime shortly after 7:00 p.m., plaintiff approached

a police car that was parked near the intersection of Suffolk and Delancey Streets.  Plaintiff had

earlier been at a restaurant/bar where over the course of approximately four hours he consumed

four drinks and various appetizers.  Abeyta Tr. at 155:08-156:09.  After he left the restaurant/bar

plaintiff was full and was feeling "a slight buzz."  Abeyta Tr. at 165:04-05.

   Plaintiff told a police officer seated in the passenger side of the vehicle that he

needed help because his bicycle was broken and no taxi would pick him up.  Abeyta Tr. at

171:07-16.  The officer, later identified as defendant Nanhao Chen, responded dismissively,

telling plaintiff "we're occupied" and immediately rolled up his car window.  Abeyta Tr. at

171:17-25.  Plaintiff then asked Chen to please roll down his window; after he did, plaintiff

repeated his request, only to be given the identical response.  Abeyta Tr. at 172:04-12.  At

plaintiff's request, Chen then rolled his window down a third time, and plaintiff asked, "Are you

really not going to give me any kind of guidance or help?"  The officer again responded with

only two words, "we're occupied," and again rolled up his window.  Abeyta Tr. at 174:16-23.  At

his deposition plaintiff recounted what happened next:

> Q.  And then that's the third time?
>
> A.  That was the third time.  So I realized that, you know, he wasn't going to help
> me out, so it's like okay.  You know, so I was a little frustrated at that moment so
> I said, you know, very sarcastically not aggressively whatsoever, you know, "You
> really look occupied sitting there doing nothing, thanks for doing your civic
> duty."  And right after I said that, I was walking towards - - going back to my
> bike, and that was  - - right as I said that I was walking away, just expecting to

figure something out.

Q. You were in the process of walking back to the passenger side to the bike on the driver's side?

A. Yes, to go figure out a new way of getting this bike - -

Q. Going around the front of the car or the back of the car?

A. Front.

Q. You were going to walk in front of the car?

A. It was parked, yes.

Q. Was it running?

A. No.

A. And you said that, this is after he rolled the window up for the third time?

A. Yes.

Q. Then what happened?

A. Immediately both doors swung open, I heard the officers yell "What the fuck did you say to us." I saw them charge towards me really fast and aggressively, I heard Spencer yell "whoa, whoa, whoa." And I put my hands up kinda, I took two steps back because they were coming at me very aggressively, I took two steps back like what is going on, very confused. And then I was grabbed incredibly hard by both shoulders, put my hands behind my back and then they just rushed me towards the hood, you know, I took probably six or seven steps, they rushed me towards the hood. You know, I fell forward and turned my head because I didn't want to obviously break my nose so I turned my head, hit the hood. And then, you know, the next thing I know, you know, I'm coming to because of whatever happened. I feel the warmth of the hood on my cheek and now my memory my senses are coming back to me. And that's when I see the crowd of people around me and I'm handcuffed very, very tight and I'm being held against the hood.

Abeyta Tr. at 174:24-176:19.

For approximately one hour defendants then forcibly held plaintiff in a prone

position, "on [his] tippy-toes," handcuffed "extremely tight" behind his back, on the hood of

their police car.  Abeyta Tr. at 184:20-185:7; 198:10-11; 201:18-21; Photograph of Scene,

attached to the Sivin Declaration as Exhibit 3.  During this period the officers initially accused

plaintiff of being drunk, and plaintiff responded by requesting that he be administered a sobriety

test.  Abeyta Tr. at 198:12-16.  The officers then accused plaintiff of being "crazy" and

"emotionally disturbed" and called an ambulance to transport plaintiff to Bellevue for a

psychological evaluation.  Abeyta Tr. at 198:17:23; 201:15-17; 207:10-16.

        While at Bellevue, plaintiff initially was guarded by Chen, Taeza, and two other

officers who collectively ridiculed and belittled him while he lay handcuffed to a gurney.

Abeyta Tr. at 208:13-209:21; 220:12-20.  What happened then borders on the Kafkaesque:

> So after an hour of being there I finally asked may I use the restroom, may I use
> the restroom because I know a nurse is going to have to allow me to use the
> restroom.  About the sixth time may I use the restroom, officer said okay, I
> believe it was that Latino male, unhandcuffed me, you know, looked down at my
> wrist because it hurt really, really bad, looked up, Officer Chen, Allan Taeza were
> turning the corner, sprinting towards the exit, the other two officers there were
> literally in lockstep behind them, running towards the exit….

Abeyta Tr. at 228:8-20.

        Uncuffed, plaintiff sat there dumbfounded.  "I just sat there because I wasn't sure

that they - - I wasn't sure what had just happened, I was very confused."  Abeyta Tr. at 229:03-

05.  Ten minutes later a doctor, who had never examined plaintiff, approached him and told him

that he was "released" and "free to go."  Abeyta Tr. at 230:16-21; Abeyta Affidavit, ¶ 3.

Plaintiff inquired about the psychological exam for which he forcibly had been brought to

Bellevue, and the doctor responded again only by telling him that he was free to go.  Abeyta Tr.

at 230:22-231:1.  Plaintiff explains in his affidavit what next occurred:

> Although at that point I was technically "discharged" from Bellevue, I did not
> immediately leave but instead asked that I be given the psychological evaluation
> that purportedly was the justification for my forcible detention by the NYPD
> officers.  I wanted documentation that I was not an emotionally disturbed person

> and that the officers who had alleged otherwise had done so for no legitimate
> reason.  I spoke with a triage nurse in the psyche unit (not a physician) who then
> directed me to wait for a psychological evaluation.  The evaluation never took
> place and I eventually left the hospital without ever being evaluated by a
> psychiatrist or other physician.

Abeyta Affidavit, ¶ 4.

Defendants never issued a summons or desk appearance ticket to plaintiff.  Chen Tr. at 133:19-134:11.  However, before Chen abruptly exited the hospital plaintiff managed to get his shield number, which he then texted to friends.[1]  Abeyta Tr. 225:15-21

The handcuffs that had been applied tightly to plaintiff for well over an hour cut into plaintiff's skin and left him with cut, swollen, and bruised wrists that were visible in photographs taken up to a month after the incident. Abeyta Tr. at 215:06-219:15.  The cuts also produced scars—albeit light ones—visible more than a year after the incident.  *Id.*  Additionally, beginning the day after the incident plaintiff noticed bruises to his shoulder and arms, began to experience neck and back pain, and developed multiple other symptoms—nausea, vomiting, headaches, slurred speech, fatigue, dizziness, inability to concentrate, sensitivity to light, vertigo—that later were diagnosed as a post-concussion syndrome.  Abeyta Tr. at 215:06-219:15; 237:8-241:18; 245:18-246:21; 262:23-263:7.  As a result of these difficulties plaintiff lost his job and, with no local means of support, relocated to California and moved back in with his mother.  Abeyta Tr. at 12:01-06; 321:23-329:14. After returning to California plaintiff continued to receive treatment for his head and other injuries at, among other facilities, the Sports Concussion Institute and the UCLA Brain Trauma Center.  Abeyta Tr. at 349:03-352:8.

Plaintiff avers that at no time during his encounter with defendants did he act

---

[1] Plaintiff did not know Taeza's identity when he commenced the instant lawsuit and therefore named as defendants in his complaint "The City of New York, Nanhao Chen, and John Doe, the third named defendant being fictitious and representing a police officer whose identity currently is unknown to plaintiff."  *See* Docket Entry No. 1.  After learning Taeza's identity through defendants' Rule 26(a)(1)(A) exchange, plaintiff filed an amended complaint adding Taeza as a defendant.  *See* Docket Entry No. 5.

aggressively or resist their use of force (Abeyta Tr. at 179:8-17; 182:05-06; 182:25-183:02; 190:05-07), and that he never raised his voice above a 5 on a scale of 1 to 10, and then only *after* he was handcuffed (Abeyta Tr. at 190:08-17; 191:06:13).

**The Medical Records**

The initial triage note from Bellevue, time stamped "2052,"[2] contains the words "intox agitated." Bellevue Medical Records, attached to Sivin Declaration as Exhibit 4 ("Bell. Recs.") at NYC066. A subsequent entry, time stamped "2146", contains the words "Pt stable for discharge." Bell. Recs. at NYC068. A subsequent entry, time stamped "2147" (ie. 55 minutes after the initial entry of "intox agitated"), contains the words "no longer intoxicated." Bell. Recs. at NYC069. A subsequent entry, time stamped "2219," contains the words "pt requests to see a psychiatrist." Bell Recs. at NYC070. While this document also contains the words "Patient sent for Psychiatric evaluation and/or clearance," there is no subsequent entry or documentation of any psychiatric evaluation of plaintiff.

The record of plaintiff's April 16, 2012 evaluation at the Urgent Care Center documents the following history: "24 yr. old was cuffed by cops this weekend and head hit top of car. Pt. believes he had LOC & no syncope. Pt. seen [illegible]." *See* Medical Records, attached to Sivin Declaration as Exhibit 5 ("Med. Recs."), at MR003. The results of a coordination exam document that "Pt. unable walk in straight line." Med. Recs. at MR004. The diagnosis is "Concussion – R/O bleed" and plaintiff is directed to go to the ER. *Id.* The Ambulance Call Report for the trip to NYU states the following: "Pt. is a 24 y/o male found ambulating on scene A&OX3 c/o dizziness and a headache since Saturday. Pt. sts. on Saturday his head was thrown against a vehicle and he was not evaluated @ a hospital. Pt. sts. he has also experienced some vomiting, nausea, and some neck, back and shoulder soreness. Pt. sts. he has

---

[2] For ease of reference, plaintiff has circled on Exhibit 4 the referenced time stamps.

also experienced some sensitivity to light….” Med. Recs. at MR008.   The “Presumptive

Diagnosis” is listed as “S/P Concussion.”  *Id.*   The NYU emergency room record documents the

following history:  “24 y/o M c/o H/A, dizziness, nausea s/p head trauma 4/14/12.  Pt. states his

head was thrown against a car hood, ? LOC, + nausea, + emesis X2 today, ….Feels like prior

concussions.”  Med. Recs. at MR012.  A CT scan of the head was read as negative.  Med. Recs.

at MR021.  Abeyta was prescribed Zofran and Norco and was discharged with a diagnosis of

“Post-Concussion Syndrome.”  Med. Recs. at MR015.

A June 6, 2013 report of a neuropsychological examination prepared by plaintiff’s

retained expert, Dr. Wayne A. Gordon, summarizes all of plaintiff’s medical treatment since the

incident.  Gordon’s report sets forth the doctor’s opinion that as a result of the April 14, 2012

incident, plaintiff sustained a concussion with resulting significant cognitive and physical

impairments.  Report of Dr. Wayne A. Gordon, attached to Sivin Declaration as Exhibit 6

(“Gordon Report”).

Approximately one month after the incident plaintiff came under the care of a

psychologist, Dr. Steven Reisner.  Reisner, who treated plaintiff until he moved back to his

mother’s home in California, diagnosed plaintiff with an acute stress disorder and Post-

Traumatic Stress Disorder resulting from the April 14, 2012 incident.  Report of Dr. Steven

Reisner, attached to Sivin Declaration as Exhibit 8 (“Reisner Report”).

**Chen’s Version**

Chen testified that just prior to the incident he had the windows of his vehicle

closed and the air conditioning running because it was warm outside and his allergies were

bothering him.  Transcript of June 24, 2013 deposition of Nanhao Chen, attached to Sivin

Declaration as Exhibit 9 (“Chen Tr.”) at 5:10-11; 16:2-13.  Chen recalls that when he rolled

down his window in response to plaintiff's approach, he smelled alcohol.  Chen Tr. at 28:10-12;
34:24-35:01.  After he responded to plaintiff's requests for assistance in a manner that plaintiff
deemed unacceptable, Chen rolled up his car window.  Chen Tr. at 38:16-21.  He then heard
plaintiff shouting, though not loud enough for Chen to make out any of plaintiff's words.  Chen.
Tr. at 44:07-45:14.  Chen characterized the volume of the "shouting" as "[p]ossibly as 7" on a
scale of 1 to 10.   Chen Tr. at 44:06-11.  Chen recalls that at some point plaintiff "probably" told
the officers, "You look real busy sitting there doing nothing, thanks for doing your civic duty."
Chen Tr. at 83:14-84:3.  Chen then exited his vehicle and without saying anything to plaintiff he
and Taeza—who also had exited the car—grabbed plaintiff, brought him to the front of the car,
and immediately forced him against the hood, causing plaintiff's chest and stomach to strike the
hood.  Chen Tr. at 48:5-10; 51:15-17; 77:15-25; 89:23-90:2.  Chen maintains that he does not
know one way or the other whether plaintiff's head also struck the car.  Chen Tr. at 51:15-17.
Thereafter, defendants forcibly kept plaintiff face-down and handcuffed on the hood of their car
until an ambulance arrived approximately one hour later.  Chen Tr. at 110:14-111:10.[3]  Chen
acknowledged that NYPD protocol provides that an EDP should not be kept in a prone position
for longer than it takes to handcuff him.  Chen Tr. at 223:09-224:02.

       According to Chen, plaintiff never became violent nor resisted during that one-
hour period when he was handcuffed; indeed, he was "fully compliant."[4]  Chen Tr. at 84:23-
85:04; 143:21-144:2.  Nevertheless, Chen called an ambulance to have plaintiff transported to
the hospital as an "emotionally disturbed person."  Chen Tr. at 92:05; 94:04-06.  Chen
determined that plaintiff was "emotionally disturbed" based exclusively on the fact that *after* he

---

[3] Chen identified the photograph attached as Exhibit 3 to the Sivin Declaration as depicting plaintiff on the hood of
the car.  Chen Tr. at 85:21-86:24.

[4] Asked why plaintiff was cuffed in the first instance, Chen claimed that plaintiff was intoxicated, screaming,
wouldn't go away, and "*might* get violent."  Chen Tr. at 80:02-12 [emphasis added].

was handcuffed plaintiff allegedly stated the following: "'You don't know who I am; I go to NYU or Columbia; why am I being arrested'; something like 'Don't put drugs on me.'" Chen Tr. at 94:4-97:14.[5]

Chen then alleged that, in any event, plaintiff had committed a criminal violation: disorderly conduct. Chen Tr. at 52:23-53-1. Upon further questioning, however, Chen effectively admitted that he had no knowledge of any conduct by plaintiff that would have constituted disorderly conduct, even as Chen understood that offense:

> Q. What did you understand the offense of disorderly conduct to be back in April 2012? If somebody asked you what's disorderly conduct, how would you have answered that question back in April 2012?
>
> A. Well, when - - if you asked me, you know, it will be somebody who is disorderly; like create public alarm, you know; who also has a fighting gesture; causes a crowd to gather; was told to disperse and wouldn't go away; and there is other people around, blocking pedestrian, vehicular traffic.
>
> Q. So let's go through that. What type of conduct had Mr. Abeyta engaged in that you would characterize as disorderly?
>
> A. Well, he was standing on the street. Obviously sometime he might get hit by a car. Sometime a car might have to swerve around to go around him, you know.
>
> Q. Did you see any cars swerve around him?
>
> A. I don't remember if there was cars driving around him.
>
> Q. Did you see him creating any public alarm?
>
> A. Well, it was a possibility that, you know, for him shouting, other people - - it might get other people's attention that were walking by.
>
> Q. Did you observe any people walking by that appeared to be reacting or responding in any manner to Mr. Abeyta?

---

[5] Although he purports that plaintiff also "needed to get, you know, detox, in a hospital," Chen admitted that he could not recall plaintiff slurring his speech, being unsteady on his feet, or having bloodshot eyes. Chen Tr. at 26:21-27:05; 29:12-15; 118:09-119:02; 121:18-19; 138:10-15; 211:16-212:17. Chen formed his conclusion as to plaintiff's intoxication solely by the smell of alcohol on his breath, plaintiff's red face—something Chen conceded could have been caused by the sun (Chen Tr. at 22:23-23:11)—and "[t]hat's all." Chen Tr. at 37:02-07.

A. I don't remember.

Q. As of the time when you exited your vehicle did you observe Mr. Abeyta in a fighting gesture?

A. No.

Q. Did a crowd gather around when he was standing outside your vehicle?

A. I - - I don't remember. Possibly.

Q. But you don't remember anything?

A. I don't remember.

Q. Was traffic being blocked?

    MR. ZIMMERMAN: Objection, asked and answered.

    MR. SIVIN: He said traffic didn't have to swerve away.

Q. But did you observe, like, a backup of traffic?

A. I don't- -I don't know.

Q. Did it appear to you that Mr. Abeyta's yelling was intended to cause public alarm?

    MR. ZIMMERMAN: Objection.

Q. In other words, did you believe that was his purpose in yelling?

A. I mean, I think his purpose of yelling was to get my attention. He really wanted a ride. Maybe that would stop his yelling.

Chen Tr. at 53:09-55:10.

Chen acknowledged that he left Bellevue immediately after he uncuffed plaintiff and before plaintiff was seen by a psychiatrist. Chen Tr. at 166:01-05; 193:17:194:02. Chen also admitted that leaving the hospital before an "emotionally disturbed person" is examined by a psychiatrist is a violation of the NYPD Patrol Guide provision that instructs the escorting officer to "[s]afeguard patient at hospital until examined by psychiatrist." *See* NYPD Patrol Guide,

Procedure No: 216-05, attached to Sivin Declaration as <u>Exhibit 12</u> ("Patrol Guide") at p. 1180, ¶ 29.  And while he also admitted that on April 14, 2012 he was aware of that provision of the Patrol Guide, Chen was unable to offer any reasonable explanation for his failure to comply with it.  Chen Tr. at 224:11-226:09.

**Taeza's Version**

Taeza's deposition was taken on June 28, 2013, four days after Chen's deposition. Transcript of June 28, 2013 deposition of Allan Taeza, attached to Sivin Declaration as <u>Exhibit 10</u> ("Taeza Tr.") at 1.  Taeza testified that prior to the April 2012 incident he had been placed on Force Monitoring as a result of an excessive number of civilian complaints against him, and that he knew that any additional complaints might result in disciplinary action against him, including possible termination from his job as an NYPD officer.[6]  Taeza Tr. at 10:04-12:24; 20:16-21:6.

Taeza testified that when he first saw him plaintiff was "looking wobbly" and "couldn't control his balance."  Taeza Tr. at 60:11; 62:06-07.  After Chen refused his requests for assistance, plaintiff adopted a combative mode, stuck his head inside Chen's open window, and balled up his fists.  Taeza Tr. at 69:22-72:05.  Plaintiff also began yelling racial epithets at the officers and "Fuck you lazy cop."  Taeza Tr. at 73:12-19.  During this period a crowd gathered nearby (*id.* at 73:20-22) and plaintiff dropped his bicycle in the middle of the street, blocking vehicular traffic (Taeza Tr. at 76:16-77:05).

Plaintiff continued screaming and acting aggressively for "[a]bout 15 minutes to 20" before Taeza finally decided to exit the vehicle and confront him.  Taeza Tr. at 74:05-21.

---

[6] In court proceedings, the NYPD has described force monitoring as a "graduated system of measures designed to reform the conduct of potentially violent police officers. ...An officer is placed on a Force Monitoring List after a certain number of complaints with the Civilian Complaint Review Board ("CCRB") have been filed against a particular officer.  If accusations of excessive force continue, sanctions such as termination of employment may be imposed." <u>Mahan v. City of New York</u>, 2005 U.S. Dist. LEXIS 14322, at *13-14 (E.D.N.Y. 2005)[internal citations to pages of the testimony of NYPD Chief Thomas Lawless omitted].

When he finally approached plaintiff, Taeza observed that his face was red, his speech was slurred, his eyes were red and glassy, and he smelled of alcohol.  Taeza Tr. at 77:12-79:24. Taeza then determined that they had to take plaintiff into custody "for his safety, my safety and the public's safety."  Taeza Tr. at 80:03-05.  When he and Chen attempted to do so, however, plaintiff began "flailing his hands."  Taeza Tr. at 84:11-12.  After they finally got him in handcuffs plaintiff began kicking the officers, which Taeza characterized as an "assault."[7]  Taeza Tr. at 87:02-03; 93:22-94:06.  When Taeza's and Chen's supervisor, Sgt. Foster, arrived on the scene Abeyta immediately started cursing at Foster and calling her a "white bitch" even before Foster said anything to Abeyta.  Taeza Tr. at 94:07-97:04.  Taeza told Foster that plaintiff had tried to kick him, and Foster responded that there must be something wrong with plaintiff.  Taeza Tr. at 183:21-184:04.

According to Taeza, neither he nor Chen ever forced or even placed Abeyta against the hood of the car; instead, plaintiff was standing virtually the entire time he was in custody.[8]  Taeza Tr. at 93:08-95:06.  The one exception was when plaintiff decided to rest and lean himself against the hood: "At some point I saw Mr. Abeyta lean on the hood facing down…He was resting.  I don't know.  But he leaned down by himself."  Taeza Tr. at 99:04-08. *But see* Photograph of Scene.

### Foster's Version

Chen's and Taeza's supervisor, Sgt. Lauren E. Foster, testified at a deposition on June 26, 2013, two days after Chen's deposition.  Transcript of June 26, 2013 deposition of

---

[7] Chen specifically denies this. Chen Tr. at 124:02 ("He wasn't kicking; he wasn't violent")

[8] Chen had acknowledged at his deposition that NYPD guidelines provide that an emotionally disturbed person never should be confined in a facedown prone position for longer than it takes to handcuff him. Chen. Tr. at 223:09-24.

Lauren E. Foster, attached to Sivin Declaration as 11 ("Foster Tr.") at 1. Foster, who arrived at the scene after plaintiff already was in handcuffs, observed that plaintiff was "kicking his legs at times, moving his shoulders and torso, moving his head, trying to walk, trying to walk around trying to move." Foster Tr. at 42:09-14. Foster claimed that plaintiff also was yelling and continually demanding from her an explanation as to why he was under arrest. She repeatedly told plaintiff that he was not under arrest, but he would not listen to reason. Foster Tr. at 36:21-37:24. Foster could not recall anything else that plaintiff said during the incident. Foster Tr. at 37:25-38:07.

Although Foster testified that she was "face-to-face" with plaintiff (Foster Tr. at 38:05-07) and that for her the event was somewhat memorable (id. at 41:13-42:06), Foster could not recall whether plaintiff's eyes were bloodshot, his speech was slurred, or whether he even smelled of alcohol (id. at 110:10-111:16). She also did not recall observing a crowd gathering in response to the event. Foster Tr. at 115:07-17.

## ARGUMENT

### I. DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO ARREST OR FORCIBLY DETAIN PLAINTIFF

Under New York law, where an arrest is made without a warrant, the arrest is presumed to be without privilege, Smith v. County of Nassau, 34 NY2d 18 (1974); Woodson v. New York City Housing Auth., 10 NY2d 30 (1961), and the burden shifts to the defendant to prove that the arrest was justified and supported by probable cause, Snead v. Bonnoil, 166 NY 325 (1901); Broughton v. State, 37 NY2d 451 (1975). Probable cause requires more than a "mere suspicion" of wrongdoing, Mallory v. United States, 354 US 449, 455 (1957), and must be based on actual "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Walczy v. Rio, 496 F.3d 139, 156 (2nd Cir. 2007).  The defendant must prove that the information he had at the time of the arrest was sufficient to conclusively establish probable cause for the arrest.  Lawson v. New York City Housing Authority, 223 AD2d 532 (2nd Dept. 1996).

Here, viewing the evidence in the light most favorable to plaintiff (*see* Desardouin v. City of Rochester, 708 F.3d 102, 104 (2nd Cir 2013)[court required on summary judgment motion to view the evidence "in the light most favorable to the non-moving party"]), defendants did not have probable cause either to arrest plaintiff for disorderly conduct or to seize him for the purposes of a psychiatric evaluation.

According to plaintiff, at the time he was seized by Chen and Taeza he was in the process of walking away from them after only having made a sarcastic comment regarding his perception of their dereliction of civic duties.  Plaintiff did not yell at or threaten defendants, did not use any abusive or obscene language or make an obscene gesture or unreasonable noise, and did not obstruct vehicular or pedestrian traffic, much less do so with the requisite criminal intent.  *See* N.Y. Penal Law § 240.20 [disorderly conduct requires that the defendant engage in one of the enumerated acts "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof"].[9]  Plaintiff merely conveyed his annoyance and frustration at the refusal of Chen, who appeared not to be particularly occupied at the moment, to offer him *any* assistance or indeed to engage him in *any* manner.  Additionally, the officers did not issue any orders or directives to plaintiff before they grabbed him, thrust him onto the hood of their vehicle, and placed him in handcuffs.  Under these circumstances, defendants indisputably lacked probable cause to arrest

---

[9] Even according to Chen, when plaintiff raised his voice "to possibly a 7",  it appeared that he did so not with the intent to cause public inconvenience, annoyance or alarm, but rather to get Chen's attention so that he could assist plaintiff.

plaintiff for disorderly conduct.

Zellner v. Summerlin, 494 F.3d 344, 374 (2nd Cir. 2007) is particularly instructive. In that case, the plaintiff was arguing with a state trooper when other troopers, without warning and without saying anything to the plaintiff, grabbed him, pushed him to the ground, and placed him in handcuffs. Id. at 350-351. The officers alleged that they had probable cause to arrest the plaintiff for disorderly conduct since he allegedly situated himself in the roadway "for the purposes of obstructing vehicle traffic." 494 F.3d at 353. In reversing the district court's grant of qualified immunity to the defendants on the plaintiff's false arrest claim, the Court of Appeals held that, crediting plaintiff's testimony that he did not block vehicular traffic and was tackled without warning, defendants did not have even "arguable probable cause" to arrest plaintiff for disorderly conduct. Id. at 374.

Chen and Taeza also lacked probable cause to conclude that plaintiff was mentally ill and a danger to himself or to others. While reasonable people can disagree as to whether plaintiff was obnoxious, self-entitled, or disrespectful, the mere making of a snide or sarcastic comment to a public official does not reasonably lend itself to an assessment that the individual "probably " is mentally ill *and* a danger to himself or to others. *See* Nicholas v. City of Binghamton, 2012 U.S. Dist. LEXIS 111736, at *12-13 (N.D.N.Y. 2012)[test is whether it reasonably appeared as a "probability" that the individual was both mentally ill *and* conducting himself in manner likely to result in serious harm] [emphasis added]. Since at a minimum there exists material, factual disputes between plaintiff on the one hand and Taeza and Foster on the other as to the nature of plaintiff's conduct preceding his forcible detention as an EDP,[10] defendants are not entitled to summary judgment on plaintiff's state or federal claims for false arrest. *See* Thompson v. Beth Isr. Med. Ctr., 1999 U.S. Dist. Lexis 5411, at *2-3 (S.D.N.Y.

---

[10] Chen largely concurred with plaintiff regarding the events that immediately preceded plaintiff's seizure.

1999)[plaintiff's claim for improper forcible detention as an EDP would not be dismissed where "[p]laintiff disputes [defendant's] testimony as to her conduct at the time of her detention"].

## II. **DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Qualified immunity is an affirmative defense on which the public official bears the burden of proof. Vincent v. Yelich, 718 F.3d 157, 166 (2nd Cir. 2013); Connecticut Crim. Defense Lawyers Ass'n v. Forst (In re State Police Litig.), 88 F.3d 111, 122 (2nd Cir. 1996). On a motion for summary judgment in a false arrest claim, the defendant cannot meet its burden on qualified immunity where there are sharply disputed versions as to the events surrounding the plaintiff's arrest. *See, e.g.* Codling v. City of New York, 68 Fed.Appx. 227, 228-229 (2nd Cir. 2003)[to be granted summary judgment based on qualified immunity in a false arrest claim, defendant must show that probable cause existed and that there was no dispute as to the pertinent events]; Aczel v. Labonia, 92 Fed.Appx. 17, *19-20 (2nd Cir. 2004)[affirming denial of summary judgment to defendant in false arrest and excessive force case where the circumstances of the officers' conduct were sharply disputed].

Similarly, in cases alleging wrongful detention of suspected emotionally disturbed persons qualified immunity cannot be determined summarily where there are disputed issues of fact regarding the conduct of the suspected EDP. In Thomas v. City of New York, 2010 U.S. Dist. LEXIS 137166 (S.D.N.Y. 2010), the court denied the City's motion for summary judgment on qualified immunity grounds where the plaintiff contested the defendants' claims that he was drunk, agitated, irate, and kicking the officers:

> Thomas claims that he was not yelling or cursing at the officers or Marrow; that he did not become angry or agitated when the officers refused to let him reenter the building to collect his belongings; and that he was voluntarily leaving the apartment building when the officers attacked him. Based on Thomas's

> version of the facts, a jury could conclude that Thomas's behavior
> was not consistent with that of an emotionally disturbed person.
> Thus, when the evidence is viewed in the light most favorable to
> Thomas, the Court cannot conclude as a matter of law that it was
> "objectively reasonable" for the officers to believe that probable
> cause existed, or that "officers of reasonable competence" could
> disagree as to whether probable cause existed to detain Thomas as
> an emotionally disturbed person. Accordingly, disputes of material
> fact preclude the grant of summary judgment on Defendants'
> qualified immunity defense.

Id. at *35-36 [internal citations omitted]; *see also* Kerman v. City of New York, 374 F.3d 93,

116 (2nd Cir. 2004)[reversing the district court's grant of qualified immunity where there were

material issues of fact regarding whether plaintiff's behavior warranted him being taken forcibly

to the hospital as a suspected EDP]; Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 459-

460 (S.D.N.Y. 2012)[resolution of qualified immunity defense on summary judgment not

appropriate where there are material factual disputes regarding the conduct of the suspected EDP].

Summary judgment on qualified immunity also should be denied where there is evidence that the

officers did not know, or ignored opportunities to determine, the seriousness of the plaintiff's

condition and whether he actually was a danger to himself or others. *See* Kerman v. City of New

York, 374 F.3d at 111.

Here, there exists at a minimum sharply disputed issues of fact regarding the

circumstances of plaintiff's arrest and reasonableness of defendants' purported determination

that plaintiff was an emotionally disturbed person.  Plaintiff describes making a polite request for

assistance from Chen and then making a sarcastic comment in response to Chen's repeated

refusal.  He then describes immediately being seized by Chen and Taeza and then held in

handcuffs without offering any resistance.  Chen essentially concurs, adding only that plaintiff

initially was yelling—though not loud enough to be heard clearly inside Chen's vehicle—had

alcohol on his breath, and that once in handcuffs stated, "'You don't know who I am; I go to

NYU or Columbia; why am I being arrested'; something like 'Don't put drugs on me,'" but otherwise was calm and fully compliant.   While Taeza essentially describes a drunk, raging lunatic who before being seized engaged in a "15 to 20 minute" rant that caused an obstruction in vehicular traffic, and after being seized attempted to assault Chen and Taeza, these sharp issues of fact cannot be resolved against plaintiff on defendants' motion for summary judgment.  *See* National Union Fire Ins. Co. v. Airborne Freight Corp., 2000 U.S. Dist. LEXIS 12773, at *8 (S.D.N.Y.) ["Summary judgment is an exercise of issue finding, not issue determination"].

### III.  DEFENDANTS USED EXCESSIVE FORCE AND COMMITTED AN ASSAULT AND BATTERY AGAINST PLAINTIFF

#### A. Plaintiff's Fourth Amendment Excessive Force Claim

The Fourth Amendment prohibits the use of excessive force when detaining or arresting an individual.  *See* Thomas v. Roach, 165 F.3d 137, 142 (2nd Cir. 1999).  In Graham v. O'Connor, 490 U.S. 386 (1989), the Supreme Court instructed that in determining whether police officers have employed excessive force in the arrest context, the courts should examine whether the use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989).  Among the circumstances that informs this evaluation are "the severity of the crime for which the arresting officers had probable cause" (Mejia v. City of New York, 119 F. Supp. 2d 232, 282 (E.D.N.Y. 2000), *citing* Graham, 490 U.S. at 396), and whether the plaintiff was compliant with police orders and not violent or resisting arrest (Matthews v. City of New York, 889 F. Supp. 2d 418, 443 (E.D.N.Y. 2012)).  Thus, while "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment," Graham, 490 U.S. at 396, force that otherwise may be deemed

21

relatively *de minimis* may be deemed excessive if the circumstances do not warrant *any* use of

force. *See, e.g.*, Mejia v. City of New York, 119 F. Supp. 2d at 282 [noting that where police

officers "manufactured" evidence on which they alleged probable cause, "any use of force would

be objectively unreasonable under the circumstances"].   Additionally, even when they have

probable cause to arrest, police officers are liable if the force they use in effecting the arrest is

excessive and/or if they continue to use unnecessary force on an arrestee who already is under

control.  *See* Gonzalez v. City of New York, 2000 U.S. Dist. LEXIS 5230, at *15 (E.D.N.Y.

2000)[denying defendant's motion for summary judgment on plaintiff's Fourth Amendment

excessive force claim where, even though there was probable cause for plaintiff's arrest, there

was no justification for keeping a calm, compliant arrestee tightly handcuffed for over two

hours].

   Here, even according to Chen, plaintiff was neither violent nor threatening when

he approached the officers.  And once in handcuffs, plaintiff at all times remained calm and fully

compliant.  Under those circumstances it was not reasonable for defendants to use any force

against plaintiff.  And it certainly was not reasonable for defendants to thrust plaintiff face-first

onto the hood of their vehicle and then keep him tightly handcuffed behind his back, prone

against the hood of the vehicle—in violation of NYPD guidelines—for approximately one hour.

   As a result of defendants' use of force, plaintiff sustained injuries more than

severe enough to make out a claim for excessive force under the Fourth Amendment.  Among his

injuries plaintiff sustained bruises to his shoulders and arm that were visible for at least a month

following the incident, swollen, bruised, and cut wrists that resulted in permanent, albeit light,

scarring of the wrists, and a concussion with significant cognitive and physical impairments.

   In Maxwell v. City of New York, 380 F.3d 106 (2nd Cir. 2004), the court reversed

the granting of summary judgment to the City on the plaintiff's Fourth Amendment excessive

force claim and rejected the district court's determination that a modest use of force resulting in a

mild concussion was, as a matter of law, not excessive:

> The Court also expressed the view that Maxwell's injury was
> insufficiently serious: "That Maxwell allegedly scraped her head
> when being shoved into the car is not sufficient for any reasonable
> jury to find an excessive force claim in this case -- minor scrapes,
> bumps or bruises potentially could occur, often unintended, during
> any arrest, and an arresting officer can not be held unremittingly
> liable for every such incident." However, her complaint alleges
> that Mannuzza's use of force in making the arrest was sufficient to
> send pain into her arm and lower back and leave her with a post-
> concussive syndrome. In light of *Robison*, we think a jury should
> assess Maxwell's account of what occurred during her arrest, along
> with any conflicting evidence the Defendants-Appellants present.

Id. at 109-110 [internal citations omitted]; *see also* Spillman v. City of Yonkers, 2010 U.S. Dist.

LEXIS 1838, at *7 (S.D.N.Y.)[denying summary judgment to police officer who caused plaintiff

to sustain a black eye and concussion]; *cf.* Lindsey v. Butler, 2013 U.S. Dist. LEXIS 88601,

at*10-11 (S.D.N.Y. 2013)[denying summary judgment to corrections officer who caused

plaintiff to sustain a mild concussion from slamming his head against the floor].[11]

Courts in the Second Circuit have upheld Fourth Amendment excessive force

claims involving injuries far less severe that those suffered by plaintiff.  In Robison v. Via, 821

F. 2d 913 (2nd Cir. 1987), the Court of Appeals permitted a Fourth Amendment excessive force

claim to survive even though the plaintiff alleged only that a police officer twisted her arm,

yanked her, and threw her up against a car, causing only bruising.  Id. at 924-925.  In Hayes v.

New York City Police Dep't, 212 F. App'x 60, 62 (2nd Cir 2007), the Second Circuit permitted

---

[11] In Lindsey the plaintiff's claim of excessive force was analyzed under the Fourteenth Amendment's due process
clause applicable to inmates awaiting trial or convicted of misdemeanors.  Lindsey v. Butler, 2013 U.S. Dist. LEXIS
88601, at *9.  A claim of excessive force under the Fourteenth Amendment requires an additional showing, not
required under Fourth Amendment excessive force claims, that the officers acted "maliciously and sadistically" in
their use of force. Graham v. Connor, 490 U.S. at 397.

an excessive force claim to survive summary judgment where the only injury was bruising.  In

Simpson v. Saroff, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990), the plaintiff was found to have

sufficiently alleged a § 1983 excessive force claim based on an allegation of having been

punched in the stomach and sustaining "swollen and bleeding wrists from the tight handcuffs, as

well as a faintly detectable scar on her left wrist…."

   Without exception, each case cited by defendants for the proposition that

"[p]laintiffs claiming far greater force, and with greater specificity than this plaintiff can offer,

have seen their claims dismissed on summary judgment or even at the pleading stage," see

Defendants' Memorandum of Law, p. 24, is readily distinguishable, either because the officers in

question used force during the course of a lawful arrest or because the plaintiff did not even

*allege* any physical injuries.  *See, e.g.* Tracy v. Freshwater, 623 F.3d 90 (2nd Cir. 2010)[officer

hit a wanted felon with a flashlight after he resisted the officers' attempt to effect a legal arrest];

Wims v. City of New York, 2011 U.S. Dist. LEXIS 78641 (S.D.N.Y. 2011)[officer used minimal

force during the course of a lawful arrest on charges of drug and weapons possession, to which

the plaintiff later pled guilty]; Elufe v. Aylward, 2011 U.S. Dist. LEXIS 11037 (E.D.N.Y.

2011)[officer, responding to a knife fight involving a plaintiff who subsequently was convicted

of robbery and weapons possession, pushed plaintiff against a window causing a bruise to his

forehead and injury to his shoulder]; Williams v. City of New York, 2007 U.S. Dist. LEXIS

55654, at *47 (S.D.N.Y. 2007)[court noted that plaintiff "did not allege any injuries" from the

alleged use of force]; Roundtree v. City of New York, 778 F. Supp. 614 (E.D.N.Y.

1991)[plaintiff alleged no physical injuries and pled guilty to disorderly conduct].  Here,

plaintiff's arrest was unlawful, plaintiff was not even *charged* with a crime or violation,[12] and plaintiff has submitted medical evidence in support of his claims of significant, long-lasting injuries stemming from defendants' use of force.  Accordingly, plaintiff has proffered more than sufficient evidence to defeat defendant's motion for summary judgment on his Fourth Amendment excessive force claim.

## B.  Plaintiff's State-Law Claim For Assault And Battery[13]

A state-law claim for assault and battery is established when a police officer uses *any* force, no matter how slight, during the course of an unlawful arrest.  *See* Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340 (2ⁿᵈ Dep't 1997) [holding that a police officer committed a battery when he touched the plaintiff during an unlawful arrest]; Budgar v. State of New York, 98 Misc.2d 588, (1979) [finding that "since the arrest was unlawful, a technical assault and battery occurred when the claimant was handcuffed and forcibly placed in the State police car"]; Pawloski v. State, 45 Misc.2d 933, 258 N.Y.S.2d 258, 265 (N.Y. Ct. Cl. 1965) [finding assault and battery arising out of false arrest where plaintiff "was touched by the State Police"].  If an incidental "touch" of a plaintiff during the course of an unlawful arrest constitutes a battery under New York law, then certainly Chen's and Taeza's use of force on the evening of April 14, 2012 constitutes a battery.

---

[12] Notwithstanding Taeza's purported assessment that plaintiff was guilty of attempted assault on a police officer and Chen's and Taeza's purported assessment that plaintiff also was guilty of disorderly conduct, plaintiff never was charged with a crime or violation and was never even issued a summons or desk appearance ticket.  While defendants suggest that the decision not to charge plaintiff was a benevolent exercise of discretion, *see* Defendants' Memorandum of Law, p. 20, n. 5, the jury is free to reject that explanation and to conclude instead that plaintiff was never charged with assault or disorderly conduct because he never committed either offense.  *Cf.* Floyd v. City of New York, 2013 U.S. Dist. LEXIS 113271, at *62-63 (S.D.N.Y. 2013)[just as the dismissal of post-stop summonses undermines the validity of the suspicions underlying the stop, "[t]he same argument applies to post-stop arrests *that were not charged*."] [emphasis added].

[13] Defendants incorrectly assert that "[i]f the Court determines that summary judgment is warranted on plaintiff's federal claims, it can, and should decline to exercise supplemental jurisdiction over the remaining state law claims."  Plaintiff was a citizen of California when this lawsuit was commenced, and defendants all are citizens of New York.  Accordingly, this Court has diversity jurisdiction over all of plaintiff's claims pursuant to 28 U.S.C. § 1332.

Even were there probable cause to arrest plaintiff for disorderly conduct or to forcibly detain him for the purpose of a psychological evaluation, plaintiff's causes of action for excessive force still would survive since "the use of excessive force is impermissible even during a lawful arrest." Weyant v. Okst, 101 F.3d 845, 858 (2nd Cir. N.Y. 1996). So even had plaintiff been blocking vehicular traffic, making unreasonable noise, or using abusive or obscene language, and even had he done so "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," none of those acts would have justified defendants' sudden, forcible seizure of plaintiff and their subsequent forcible and lengthy confinement of plaintiff in a prone position with his hands tightly cuffed behind his back.

## IV.  PLAINTIFF'S FIRST AMENDMENT CLAIM

Citing only Curley v. Village of Suffern, 268 F.3d 65 (2nd Cir. 2001), defendants seek summary judgment on plaintiff's First Amendment claim for retaliatory arrest solely on the ground that "plaintiff has not made any allegation that the actions of [the defendants]...have significantly or even partially chilled his subsequent exercise of free speech." Defendants' Memorandum of Law at p. 31. The Second Circuit has since clarified that proof that the plaintiff's speech was actually chilled no longer is a *sine quo non* of a valid First Amendment retaliation claim; instead, it is sufficient if the defendant's retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." Gill v. Calescibetta, 157 Fed. Appx. 395, 381 (2nd Cir. 2005).

Thus, in Bartels v. Inc. Vill. of Lloyd, 751 F. Supp. 2d 387 (E.D.N.Y. 2010), the court noted that where the alleged retaliatory conduct causes an injury separate and apart from any chilling affect—as in an arrest or prosecution without probable cause—the 'chilling' element is not necessary to state a claim." Id. at 397, *citing* Morrison v. Johnson, 429 F.3d 48, 51 (2d

Cir. 2005).  Similarly, in <u>Bradley v. City of New York</u>, 2007 U.S. Dist. LEXIS 7811, at *21-22

(S.D.N.Y. 2007), a lawsuit alleging causes of action, *inter alia*, for retaliatory arrest and

prosecution, the court denied the defendants' motion to dismiss those causes of action stating that

the plaintiff "need not show a chilling effect."  <u>Id</u>. at *22, *citing* <u>Yuan v. Rivera</u>, 48 F. Supp. 2d 335,

351 n.6 (S.D.N.Y. 1999). Here, since plaintiff alleges that defendants falsely arrested and used

excessive force against him in retaliation for exercising his First Amendment rights, plaintiff is

not also required to demonstrate or even allege a chill in the exercise of those rights.

### V.   THIS COURT SHOULD SEARCH THE RECORD AND AWARD JUDGMENT TO PLAINTIFF AND AGAINST CHEN ON THE FIRST, SECOND, THIRD, AND FOURTH CAUSES OF ACTION IN PLAINTIFF'S AMENDED COMPLAINT

Although plaintiff has not specifically moved for summary judgment, this Court can

search the record and grant summary judgment in favor of plaintiff and against Chen.  *See* <u>Coach</u>

<u>Leatherware Co. v. Ann Taylor, Inc</u>., 933 F.2d 162, 167 (2nd Cir. 1991).  Plaintiff maintains that,

based on Chen's own testimony, Chen fails as a matter of law to meet his burden of demonstrating

that his warrantless arrest of plaintiff was based on probable cause.  Chen's characterization of the

benign nature of plaintiff's conduct both before and after he forcibly seized him is such that no

reasonable police officer in Chen's position could have believed that he had probable cause to arrest

plaintiff for disorderly conduct or any other charge.  *See* <u>Flores v. City of Mount Vernon</u>, 41 F.

Supp. 2d 439, 443-444 (S.D.N.Y. 1999)[where defendant's own version of events did not give him

"reason to believe that [plaintiff] had committed or was about to commit a crime….," summary

judgment in favor of the plaintiff on his cause of action for false arrest is required].

Chen also admitted that after handcuffing plaintiff the only basis for his purported

conclusion that plaintiff was an EDP were the following statements allegedly made by plaintiff:

"'You don't know who I am; I go to NYU or Columbia; why am I being arrested'; something like 'Don't put drugs on me.'" Chen Tr. at 94:17-20-97:07.  Viewing these comments in the light most favorable to him, Chen at most was justified in concluding that plaintiff was arrogant, self-entitled, and perhaps a little paranoid.  Chen had no reasonable basis for concluding that plaintiff, whom he acknowledges remained calm and compliant at all times after he was placed in cuffs, also was mentally ill and a danger to himself or others.

Plaintiff had a First Amendment right verbally to air his grievance with Chen and First and Fourth Amendment rights to do so without being subjected to violent retaliation.  Chen should not be allowed to escape liability simply by alleging in conclusory fashion and with no evidentiary support that he reasonably believed Abeyta had committed a crime and/or was emotionally disturbed.  Accordingly, plaintiff respectfully requests that the Court search the record and grant summary judgment in favor of plaintiff and against Chen on plaintiff's state and federal causes of action for false arrest and excessive force.

## VI. DEFENDANTS' MOTION FOR BIFURCATION SHOULD BE DENIED

Although Fed. R. Civ. P. 42(b) allows the court to bifurcate the liability and damages portions of a trial, "[b]ifurcation is…the exception, not the rule, and the movant must justify bifurcation on the basis of the *substantial* benefits that it can be expected to produce." Lewis v. City of New York, 689 F. Supp. 2d 417, 428 (E.D.N.Y. 2010), *citing* Dallas v. Goldberg, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001)[emphasis added].  Where the issues of liability and damages are intertwined, bifurcation is not appropriate.  Vichare v. AMBAC Inc., 106 F.3d 457, 466 (2nd Cir. 1999); Llerando-Phipps v. City of New York, 390 F. Supp. 372 (S.D.N.Y. 2005).  Some other factors to which the courts routinely look in determining whether to bifurcate are "(1) whether significant resources would be saved by bifurcation; (2) whether bifurcation will increase juror

comprehension, and (3) whether bifurcation will lead to repeat presentations of the same evidence and witnesses." Tafari v. Goord, 2011 U.S. Dist. LEXIS 118871, at *3 (W.D.N.Y. 2011).

Judged against these standards, it is readily apparent that bifurcation is not warranted. Separating the issues of damages and liability would not be feasible in this case, and instead would result only in significant added expense and inconvenience to witnesses and to plaintiff.

Here, the issues of liability (including whether defendants used excessive force), and damages (including the extent of any injuries resulting from defendants' use of force), are inextricably interwoven. Plaintiff anticipates calling several healthcare providers from among the many who have evaluated and/or treated him, both in New York and California, since the date of the incident. Plaintiff intends to offer testimony from these witnesses not only as to the extent of his injuries, but also as to their causal connection to the April 14, 2012 incident. Requiring plaintiff to limit these witnesses' testimony in the first instance to a narrowly circumscribed discussion of "causal connection" not only risks confusing the jury, but it also results in a significant financial burden to plaintiff in having to pay the witnesses for two separate days of testimony.

Bifurcation also would present significant scheduling difficulties. Some of the witnesses—healthcare providers and retained experts—require pre-payment of their fees and significant advance "booking" for a date certain. While it is feasible now to book and pre-pay Dr. "X" for his complete testimony (liability and damages) on, say, the morning of Tuesday, September 24 and Dr. "Y" for that afternoon, one cannot anticipate when, if at all, either doctor will be needed for the second phase of his or her testimony. That would depend on as yet unknown contingencies, including the time it will take the jury to render a verdict on the liability phase of the trial.

Certain lay witnesses whom plaintiff may call also are in a position to offer

29

testimony relevant to both liability and damages.  Part of the purported justification for detaining plaintiff was that he was intoxicated and exhibited possible signs of mental illness.  Plaintiff has identified several witnesses who were with him at the bar/restaurant in the hours immediately preceding the incident and one witness, California resident Spencer Schlee, who was present during plaintiff's encounter with defendants.  Some of these individuals will be offered by plaintiff not only to rebut Taeza's claim as to plaintiff's level of intoxication, but also as so-called "before and after" witnesses, offering their observations of plaintiff's physical and cognitive decline since the incident. Bifurcating the liability and damages portions of this trial therefore would result in inconvenience to those witnesses as well.

Defendants appear unwittingly to concur in plaintiff's assessment of the inextricability of the liability and damages issues in this case.  Specifically, defendants' Memorandum of Law references plaintiff's hospital records and prior medical history to support their suggestion that plaintiff's head did not strike the hood of the car and that his current symptoms likely are the result of prior, documented head injuries.  Having attempted to use plaintiff's medical records and history to debunk plaintiff's liability and damages claims, defendants cannot now seriously deny that the issues of liability and damages are interwoven.

Further, a determination by the jury that plaintiff did not strike his head would not, as suggested by defendants, put to rest the issues of excessive force and false arrest and avoid a second trial on damages.  If the jury concludes that defendants otherwise used excessive force and/or falsely arrested plaintiff, a second trial on damages still would be required.  In that event, plaintiff still would offer expert medical testimony, including that of the doctor who diagnosed and treated him for Post-Traumatic Stress Disorder stemming from the incident of April 14, 2012.  *See* March 5, 2013 Report of Dr. Steven Reisner, attached to Sivin Declaration

as Exhibit 8.

Finally, defendants argue that allowing plaintiff's medical experts to testify to the debilitating effects of plaintiff's injures before there is a liability determination would be prejudicial.  Defendants point to the fallacy of expert opinions based exclusively on the self-serving, unsworn statements of parties to a lawsuit.  In so arguing, defendants understate the nature and quantum of proof adduced by plaintiff in support of his claims and severely underestimate the intelligence of prospective jurors.  Any reasonably intelligent juror will reject expert testimony based exclusively on uncorroborated, self-serving statements by a party to the lawsuit.  Indeed, such testimony likely would backfire and, if anything, inflame the jury against plaintiff.  Defendants' purported concerns over juror confusion therefore are unwarranted.

## CONCLUSION

Based on the foregoing, plaintiff submits that defendants' motion for summary judgment should be denied in its entirety, with the exception of that portion of defendants' motion seeking to dismiss plaintiff's claims for intentional infliction of emotional distress.  Plaintiff also requests that the Court search the record and grant summary judgment in favor of plaintiff and against Chen on the First, Second, Third, and Fourth causes of action in plaintiff's amended complaint.  Finally, plaintiff requests that defendants' motion for bifurcation be denied.

Dated:  New York, New York
      September 3, 2013

Yours, etc.
SIVIN & MILLER, LLP

By_____
    Edward Sivin
    Attorneys for Plaintiff
    20 Vesey St., Suite 1400
    New York, NY  10007
    (212) 349-0300